# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 3251 | **DATE** | September 17, 2001 |
| **CASE TITLE** | Chicago Printing Co v. Heidelberg USA Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion to dismiss [ ] is denied. ENTER MEMORANDUM OPINION. [7-1]

(11) X [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| X | Notices mailed by judge's staff. | | SEP 25 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | 9/17/0 | |
| | Mail AO 450 form. | | docketing deputy initials | 15 |
| | Copy to _____ | | KAM | |
| KAM | courtroom deputy's initials | FILED FOR DOCKETING 01 SEP 24 PM 12: 51 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO PRINTING COMPANY,<br>an Illinois corporation, | ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | |
| v. | ) <br> ) | No. 01 C 3251 |
| HEIDELBERG USA, INC.,<br>a Delaware corporation, | ) <br> ) <br> ) | DOCKETED |
| Defendant. | ) <br> ) | SEP 2 5 2001 |

## MEMORANDUM OPINION

Before the court is defendant's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is denied.

### BACKGROUND

This is an action brought by plaintiff Chicago Printing Company ("Chicago Printing") against defendant Heidelberg USA, Inc. ("Heidelberg") for fraudulent misrepresentation (fraudulent inducement) and negligent misrepresentation in connection with Chicago Printing's purchase of a used printing press from Heidelberg.

The following relevant facts, drawn from the complaint, are taken as true for purposes of this motion. Chicago Printing provides high-quality, commercial paper printing services to customers in Illinois. Heidelberg manufactures, sells, and

services printing presses and other equipment throughout the United States. Between summer 1999 and early October 1999, Donald Outlaw, an employee of Chicago Printing, met several times with Bob Newlin, an agent of Heidelberg, at Chicago Printing's offices. They discussed the possible replacement of Chicago Printing's 5-color Model MOFP-H 1994 Heidelberg printing press with a used 40-inch, 6-color Heidelberg press. In these discussions, Outlaw described Chicago Printing's requirements for a replacement press: low-impression, high-quality, and used exclusively to print high-quality paper projects, such as annual reports. Outlaw told Newlin that Chicago Printing would not consider purchasing any press that had been used to print "board."[1]  (Complaint, ¶¶ 1-2, 4-5.)

In late September 1999, at a meeting at Chicago Printing's offices, Newlin told Outlaw that he had found the "perfect press" for Chicago Printing. Newlin said that this press had just come back on the market due to a Pennsylvania purchaser having backed out of a deal due to unexpected financial difficulties. Newlin also said that this press had never printed board, it had been refurbished by Heidelberg's subcontractor, Stoner & Company, Inc. ("Stoner"), and all worn or questionable parts had been replaced. In early October 1999, when Outlaw and Newlin visited Stoner to inspect the press, Newlin said that Chicago Printing could not run

---

[1] The briefs and pleadings do not fully explain what printing "board" means.

and print test the press because it had been dismantled in anticipation of shipment to the Pennsylvania purchaser. Newlin assured Outlaw that the press was "like new," in perfect operating condition, and would print as well as Heidelberg's new press in its Mount Prospect showroom. Plaintiff alleges that in reality, the press had one or more stress fractures. (Id., ¶¶ 6-8.)

Relying on Newlin's representations about the press, Chicago Printing signed a written contract (the "Contract") on October 7, 1999 to purchase the press from Heidelberg for $1,350,000. On November 2, 1999, William Carver, Heidelberg's Regional Manager, attended a meeting at Chicago Printing's offices, where he assured Chicago Printing that it would not have the kind of problems with this press that Chicago Printing had experienced with its previous press and that the press would handle any job that Chicago Printing wanted to print. (Id., ¶¶ 9-10.)

Later in November, Outlaw and others at Chicago Printing were warned by a paper salesman about a Heidelberg press owned by Dorholt Printing in Minneapolis (the "Dorholt press") that had been used to print board and had experienced pervasive operating difficulties. Outlaw met with Newlin to discuss his concerns about the Dorholt press and to ask whether the press Chicago Printing had just bought was in fact the Dorholt press. He told Newlin that under no circumstances would Chicago Printing accept delivery of the Dorholt press. Newlin said that the Dorholt press was a

different press, and that the press Chicago Printing had bought was previously owned by a company in either Minnesota or Iowa that ran high-quality jobs similar to those done by Chicago Printing. Newlin also said that the press had been used only to print high-quality annual report and prospectus-type jobs on high-quality paper. (<u>Id.</u>, ¶¶ 11-13.)

In December 1999, Chicago Printing accepted delivery of the press from Heidelberg. (<u>Id.</u>, ¶ 15.) Since its installation, the press has never worked properly. Within a week of installation, more than 200 parts had to be replaced. During the six months after installation, a steady stream of repairmen and technicians serviced the press. Nonetheless, it continued to malfunction, producing "slurring," roller marks, and color inconsistencies. (<u>Id.</u>, ¶¶ 21-22.)

In June 2000, Carver and Newlin met with Outlaw, reaffirmed Heidelberg's representation that the press was in "like new condition," and promised to fix the problems. (<u>Id.</u>, ¶ 23.) Between fall 2000 and the filing of plaintiff's complaint, Heidelberg attempted to repair the press, stated that it had the capacity to do so, and asked for Chicago Printing's patience and understanding. Additional meetings between Chicago Printing and Heidelberg took place in December 2000 and January 2001. The parties discussed the continuing problems with the press, but

ultimately were unable to resolve the controversy amicably. (Id., ¶¶ 25-28.)

Chicago Printing alleges that Newlin and Carver's representations regarding the press were fraudulent because the press was in fact the Dorholt press, was used almost exclusively to print board, had never been used to print high-quality projects, had not been fully refurbished, and could not handle the kind of high-quality printing that Heidelberg knew Chicago Printing intended. Moreover, the press had been plagued with serious problems and prior damage that were known to Heidelberg but not disclosed to Chicago Printing. Chicago Printing also pleads, on information and belief, that Heidelberg concealed that it had damaged the press by too hastily removing it from Dorholt. (Id., ¶¶ 17-19.) Plaintiff alleges that Newlin and Carver's representations were made to induce plaintiff to buy the press and accept delivery. (Id., ¶ 16.) Plaintiff would not have purchased the press or accepted delivery had it known of the misrepresentations. (Id., ¶ 20.)

Chicago Printing originally filed this action in the Circuit Court of Cook County, seeking rescission of the Contract, a refund of the purchase price and any prepayment penalty on the loan, actual damages in excess of $600,000, $10,000,000 in punitive damages, and attorney's fees. On May 7, 2001, Heidelberg removed

the action to this court on the basis of diversity jurisdiction. Heidelberg now moves to dismiss plaintiff's claims.

## DISCUSSION

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 294 (2d ed. 1990). When evaluating such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. Hentosh v. Herman M. Finch Univ. of Health Sciences, 167 F.3d 1170, 1173 (7th Cir. 1999); Jang v. A.M. Miller & Assocs., 122 F.3d 480, 483 (7th Cir. 1997). Dismissal is appropriate only if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Ledford v. Sullivan, 105 F.3d 354, 356 (7th Cir. 1997) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)); Jones v. General Elec. Co., 87 F.3d 209, 211 (7th Cir.), cert. denied, 519 U.S. 1008 (1996).

## A. Choice of Law

Before we can decide whether plaintiff has adequately stated claims, we must determine the applicable law. Heidelberg contends that Illinois law applies because Illinois has the most significant contacts with plaintiff's tort claims. (Defendant's Reply at 2-

5.)[2] Chicago Printing, on the other hand, contends that Georgia law applies to its claims because the parties expressly agreed in the Contract that Georgia law would apply.[3] (Plaintiff's Response at 6-9.)

Chicago Printing's argument is not persuasive because it is based on the incorrect assumption that the choice-of-law provision in the Contract applies to plaintiff's claims. The language of the Contract states that it would be governed by Georgia law. This means that Georgia law controls only those issues involving Chicago Printing's and Heidelberg's rights and duties under the Contract itself. Although the parties easily could have done so, they did not draft a more expansive contractual provision that encompassed matters such as tortious conduct leading up to the Contract's execution (which is alleged here) or other actions relating to their relationship. Chicago Printing's tort claims for fraudulent inducement and inducement by negligent misrepresentations are separate from the Contract, as they stem from events that occurred prior to its execution. Accordingly, the parties' contractual

---

[2] This argument differs from the argument Heidelberg made in the memorandum in support of its motion. Heidelberg's initial contentions were as follows: the Contract provided that it would be governed and enforced by Georgia law, see Complaint, Ex. 1 at 2. Application of Georgia law encompasses not only its substantive law, but also its choice-of-law rules. Because Georgia's choice-of-law rules provide that tort claims must be decided by the place of the wrong, which is Illinois, then Illinois law applies to plaintiff's tort claims. (Defendant's Memorandum at 3-4.) Apparently, Heidelberg has (wisely) abandoned that reasoning.

[3] Chicago Printing also suggests that the choice-of-law question is not highly significant because application of either Georgia law or Illinois law would produce the same result.

choice of law does not apply to plaintiff's claims. <u>See</u> <u>Coram Healthcare Corp. v. Aetna U.S. Healthcare Inc.</u>, 94 F. Supp. 2d 589, 593 (E.D. Pa. 1999) (holding that contractual choice-of-law provision did not govern fraudulent inducement and negligent misrepresentation claims); <u>Union Oil Co. v. John Brown E & C</u>, No. 94 C 4424, 1994 WL 535108, at *2-3 (N.D. Ill. Sept. 30, 1994) (same; negligent misrepresentation); <u>Mellon Bank, N.A. v. Miglin</u>, No. 92 C 4059, 1995 WL 230492, at *7 (N.D. Ill. Jan. 10, 1995) (explaining that when the cause of action arises independently from the contract, the court should perform a separate choice-of-law analysis); <u>Heller Fin., Inc. v. Peavy</u>, No. 86 C 7802, 1987 WL 12943, at *4 n.5 (N.D. Ill. June 23, 1987).

Absent a controlling contractual provision, a federal court exercising diversity jurisdiction must consult the choice-of-law rules of the state in which the court sits to determine which state's substantive law should apply. <u>See</u> <u>GATX Leasing Corp. v. National Union Fire Ins. Co.</u>, 64 F.3d 1112, 1114 (7th Cir. 1995). Under Illinois law, the law applicable to tort claims is that of the state in which the tort occurred unless another state has a more significant relationship to the occurrence or the parties. <u>See</u> <u>Walters v. Maren Eng'g Corp.</u>, 246 Ill. App. 3d 1084, 1090, 617 N.E.2d 170, 173 (1st Dist. 1993). The two most important factors relevant to the determination of where the tort occurred are the place of injury and the place of conduct causing the injury. <u>See</u>

Miller v. Long-Airdox Co., 914 F.2d 976, 978 (7th Cir. 1990);
Torraco v. American Airlines, Inc., No. 94 C 1852, 1996 WL 6560, at
*7 (N.D. Ill. Jan. 4, 1996). Here, it is clear from the
allegations contained in the complaint that both the alleged injury
and the alleged conduct occurred in Illinois. Thus, we will apply
Illinois law to plaintiff's claims.

B.    **Plaintiff's Claims**

     To state a fraudulent inducement claim, a plaintiff must
allege that (1) the defendant made a false statement of material
fact; (2) the defendant knew that the statement was false; (3) the
statement was intended to induce another's reliance; (4) the
statement did induce reasonable reliance; and (5) the statement
caused damage to the party relying on it. See J.C. Whitney & Co.
v. Renaissance Software Corp., No. 99 C 3714, 2000 WL 556610, at *8
(N.D. Ill. Apr. 19, 2000), adopted in part on relevant grounds and
modified in part on other grounds, 98 F. Supp. 2d 981 (N.D. Ill.
2000). Heidelberg argues that plaintiff's claims must be dismissed
because plaintiff has failed to allege reasonable reliance on the
purported misrepresentations.

     The Contract states that "[a]ll used equipment is sold to
buyer AS IS WHERE IS with all faults, unless otherwise indicated."
(Complaint, Ex. 1 at 2.) The Contract also contains a disclaimer
that reads as follows:

     EXCEPT AS STATED ABOVE, THERE ARE NO WARRANTIES, EXPRESS
     OR IMPLIED, THAT EXTEND BEYOND THE DESCRIPTION OF THE

EQUIPMENT ON THE FACE OF THE CONTRACT.  SELLER EXPRESSLY
DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, THAT THE
EQUIPMENT SOLD HEREUNDER IS MERCHANTABLE, OR FIT FOR ANY
PARTICULAR PURPOSE.  THE STATED EXPRESS WARRANTY IS IN
LIEU OF ALL LIABILITIES OR OBLIGATIONS OF SELLER FOR
DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE
DELIVERY, USE OR PERFORMANCE OF THE EQUIPMENT AND ANY
SOFTWARE.[4]

(<u>Id.</u>)  In addition, the Contract states under the heading
"VARIATIONS IN PRODUCTION":

> The speed or production rate which the Buyer is able to
> obtain with the equipment depends on a number of
> variables not under Seller's control including, but not
> limited to, operator skill, equipment maintenance, the
> nature of the desired product, the ink, paper, film, and
> other materials used, ambient conditions, and the
> specific manner in which Buyer uses the equipment.  The
> Seller cannot and does not make any representations or
> warranty concerning the speed at which Buyer will be
> able to operate the equipment or the amount of waste
> produced or volume or quality of production that Buyer
> will achieve with the equipment.

(<u>Id.</u>)  Heidelberg argues that the presence of the "as is" clause,
the disclaimer, and the "variations in production" provision
precludes Chicago Printing's reasonable reliance on the alleged
pre-contractual representations regarding the press.

The cases cited by Heidelberg in support of its argument stand
for the principle that a party cannot claim that it reasonably
relied on pre-contractual representations if that party could have
discovered the fraud by reading the contract.  <u>See Regensburger v.
China Adoption Consultants, Ltd.</u>, 138 F.3d 1201, 1207-08 (7th Cir.

---

[4]  The "stated express warranty" referred to in this provision was a 90-
day parts and labor warranty.  (Complaint, Ex. 1, at 1.)

1998) ("A party who could have discovered the fraud by reading the contract, and in fact had an opportunity to do so, cannot later be heard to complain that the contractual terms bind her."); <u>Kusiciel v. LaSalle Nat'l Bank</u>, 106 Ill. App. 3d 333, 435 N.E.2d 1217 (1st Dist. 1982) (affirming trial court's holding that "plaintiffs were not entitled to claim that they were deceived about the scope of the provision in the lease limiting competition when the scope of that provision was clearly set forth in the lease"); <u>Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.</u>, 250 F.3d 570, 574-75 (7th Cir. 2001) (stating that, "[a]s long as the complaining party could have discovered the fraud by reading the contract and had the opportunity to do so, Illinois courts have refused to extend the doctrine of fraudulent inducement to invalidate contracts").

These cases are distinguishable from the instant case because they involved claims where the oral fraud was discoverable by reading the terms of the contract. As the court stated in <u>J.C. Whitney</u>, the cases "indicate that reliance on precontractual fraud statements is precluded as unreasonable only where the contract 'flatly contradicts' them." 2000 WL 556610, at *10.

Chicago Printing's claims involve prior representations about the printing press that are not contained or referred to in the Contract. Specifically, Chicago Printing alleges that Heidelberg made the following misrepresentations regarding the press: it was not previously owned by Dorholt, it had not come from Dorholt, it

was not used to print board, it was used to print only high-quality jobs, and it had been fully refurbished. Neither the "as is" clause nor the warranty disclaimer nor the "variations in production" provision explicitly contradicts these alleged misrepresentations. In other words, none of these provisions is sufficiently specific such that Chicago Printing could have "discovered" the fraud. The J.C. Whitney court explained why such provisions do not automatically negate the element of reasonable reliance:

> [A] warranty disclaimer tells a contracting party that extra-contractual statements are not part of the agreement. However, these expressions of the metes and bounds of the contract do not on their face purport to tell a party that any unincorporated precontract statements are incorrect, or that by agreeing to an integration clause or a warranty disclaimer a party is waiving fraud claims based on unincorporated precontract statements. Indeed, because of the ubiquity of such clauses, such a rule would in substance require a contracting party to expressly preserve a claim for fraudulent inducement, and would allow a party to contract out of fraud claims by implication.

Id. Because the complaint clearly alleges actionable misrepresentations that would not have been revealed by reading the Contract, we deny Heidelberg's motion to dismiss.

## CONCLUSION

For the foregoing reasons, defendant's motion is denied.


DATE:            September 17, 2001


ENTER:

_____
John F. Grady, United States District Judge