IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
DEC 2 2 2003
UNITED STATES DISTRICT COURT

DOCKETED
DEC 2 9 2003

| | | |
|---|---|---|
| CHICAGO PRINTING COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 01 C 3251 |
| | ) | |
| v. | ) | Judge John F. Grady |
| | ) | |
| HEIDELBERG USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION IN LIMINE REGARDING EXPERT TESTIMONY OF LOUIS G. DUDNEY

Plaintiff, Chicago Printing Company, ("Chicago Printing"), by its attorneys, Jeffrey Cole, Andrew Staes, and Stephen Scallan, moves to limit the expert testimony of Louis G. Dudney ("Dudney") as it relates to the mitigation of damages by Chicago Printing. Chicago Printing's reasons for this proposed limitation are described below.

### FACTS

In September, 2001, Steven Poplin, printing press repairman for Druck-Tech Inc., examined Chicago Printing's six-color press and recommended a gear alignment and gripper replacements, repairs estimated to cost between $10,000 and $15,000. (Poplin Dep., July 11, 2003, at 100). However, Poplin began his diagnosis of the press by examining the grippers merely "to set some type of a foundation to build on, as far as repair went," not because he thought new grippers would repair the press. (Poplin Dep., July 11, 2003, at 76).

> The money could be such a great amount that you really want to know what you are in for before you jump into something like that because there is many things you can do that aren't going to necessarily repair that problem, but they need to be done so that when you do reach that point where you think the machine needs to be, you aren't being affected by this other thing[.]

1

146

(Poplin Dep., July 11, 2003, at 76).

Poplin emphasized that the gripper and gear work was "the first phase" of his repair work to the press, because "we had to start somewhere." (Poplin Dep., Oct. 3, 2003, at 59). The total repair bill could have been as much $300,000, so Poplin told Don Outlaw that the gripper and gear work was where he wanted to start, and said that Mr. Outlaw should tell him "when it's good enough, or when you – if you get to the point where you can't afford any more." (Poplin Dep., Oct. 3, 2003, at 54, 59-60). Chicago Printing did not authorize the gripper and gear work until August, 2002. (Poplin Dep., July 11, 2003, at 100-04). The gripper and gear work did not repair the press; among the current actual or potential problem areas are the urethane grippers on the triple drums; the transfer drums; the pad heights on the gripper bars; and the transfer cylinder triple drum gears. (Poplin Dep., July 11, 2003, at 198-99).

In his Expert Rebuttal Report of September 5, 2003, attached hereto as Exhibit 1, Dudney, a certified public accountant, argues that the proper period over which to measure damages ended in September, 2001. (Exh. A, at 2, 12, 18). Dudney opines that Chicago Printing failed to mitigate its damages starting in September, 2001, because it did not immediately order the gear and gripper work Poplin recommended. (Exh. A, at 13). Dudney is neither an expert in press repair nor a lawyer. This testimony should not be allowed.

## ARGUMENT

Dudney proposes to deliver his opinion of Chicago Printing's damages theory. The proposition that Dudney is not qualified to give a legal opinion scarcely needs citation of authority. By definition, he lacks the "knowledge, skill, experience, training, or education," to be "qualified as an expert" to opine on any legal matter. Fed. R. Evid. 702.

2

Indeed, witness testimony on the law always is excluded because "the *judge* (or the jury as instructed by the judge) can determine equally well" the law, and the special legal knowledge of the judge makes the witness' testimony superfluous. VII Wigmore, Evidence § 1952 (Chadbourn rev. 1978). That is why opinions on the law are inadmissible even where the witness is a lawyer or a judge. See Specht v. Jensen, 853 F.2d 805, 807-08 (10th Cir. 1988) (en banc) (lawyer could not testify as to his interpretation of applicable law because "it is axiomatic that the judge is the sole arbiter of the law and its applicability."); Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505, (2d Cir. 1977), *cert. denied*, 434 U.S. 861 (1977) (securities law expert barred from testifying as to his opinion of the legal obligations of the parties to the contract because "[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge."); United States v. Zipkin, 729 F.2d 384 (6th Cir. 1984) (bankruptcy judge could not testify as to the applicable law because "the trial judge does not need the judgment of witnesses.").

Nonlawyer expert witnesses fare no better when their testimony veers into the province of the trial judge. See, i.e., West v. Waymire, 114 F.3d 646, 652 (7th Cir. 1997) (Posner, J.) (criminal justice professor not allowed to draw legal conclusion from town's alleged negligent supervision of police officer; also, the testimony exceeded his professional competence); Bammerlin v. Navistar Int'l. Transp. Corp., 30 F.3d 898, 900 (7th Cir. 1994) (Easterbrook, J.) (auto safety experts unfamiliar with the legal interpretation of auto safety standards could not testify as to their interpretations of federal automobile regulations).

If Dudney is allowed to testify that damages are barred after September, 2001, based on his opinion that Chicago Printing failed to mitigate damages, he will intrude upon the province of the Court, confuse the jury, and testify on a concept exceeding his professional competence,

3

about which he admits he knows nothing.[1]  Admission of this testimony would, therefore, violate the principle that a "district judge should assure himself, before admitting expert testimony, that the expert knows whereof he speaks." Bammerlin, 30 F.3d at 901 (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

## CONCLUSION

Defendant's expert is not qualified to testify as to whether Plaintiff should have mitigated its damages beginning in September, 2001.  Only the trial judge may inform the jury of the applicable law, and Defendant's expert should not be permitted to intrude on the Court's duty by instructing the jury on applicable principles of law.  For these reasons, all references to mitigation of damages in Dudney's report should be excluded.

---

[1] Dudney's deposition contains the following colloquy:

Q: Do you have an understanding or an opinion as to what litigants are required to do to mitigate its damages?
A: Well, I think that's a legal question that you are asking me, and I didn't look at that aspect of my analysis as a legal question.  I looked at it more as an economic question; which is, that if someone is incurring harm, then I would look at what is the cost of the cure.

* * *

Q: And you don't know if the law looks at it differently than you as an economist would view that particular analytical problem?
A: I am not an economist, I am a CPA, but nonetheless I would look at it from an economic perspective.
Q: You used the word economic.  You looked at it from an economic perspective, not from a legal perspective, is that correct?
A: That's correct.  I'm not a lawyer.
Q: And you don't have an opinion as to what the law requires a litigant to do in terms of mitigation of damages?
A: No.  That would be I think a legal opinion.  I don't have a legal opinion in this case.

(Dudney Dep., Nov. 11, 2003, at 35-36).

4

Respectfully submitted,

JEFFREY COLE
ANDREW STAES
STEPHEN SCALLAN

Cole & Staes
321 South Plymouth Court
Suite 1150
Chicago, IL 60604
312-697-0200

5

## CERTIFICATE OF SERVICE

I, Jeffrey Cole, hereby certify that I have caused a copy of the foregoing Chicago Printing's Motion In Limine Regarding Expert Testimony of Louis G. Dudney, to be served on Andrew Porter, Holland & Knight LLP, 131 S. Dearborn St, 30th Floor Chicago, IL 60603 by facsimile on December 22, 2003.

*Jeffrey Cole*
JEFFREY COLE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHICAGO PRINTING COMPANY       )
                               )
              Plaintiffs,      )       No.01 C 3251
                               )
v.                             )       Judge John F. Grady
                               )
HEIDELBERG USA, INC.,          )       Magistrate Judge Arlander Keys
                               )
              Defendants       )
                               )

Expert Rebuttal Report of Louis G. Dudney, CPA



DEPOSITION
EXHIBIT

Dudney 1
11-11-03

Exh. 1

## I.    Introduction

A lawsuit has been filed alleging that Heidelberg USA, Inc. ("Heidelberg") misrepresented the history of a used printing press to Chicago Printing Company ("CPC") thereby inducing CPC to acquire the printing press. I have been retained by Heidelberg's counsel, Holland & Knight, to analyze and opine on the damages incurred by CPC if Heidelberg is found liable in this matter.

I am a Principal with AlixPartners, LLC, a financial and operational consulting firm. Prior to joining AlixPartners, LLC, I was a Partner with PricewaterhouseCoopers. I am a CPA licensed in Illinois. All of the opinions presented in this report are based on my analysis of the available information and my experience, education and expertise as a CPA and financial consultant. Exhibit 1 contains a copy of my curriculum vitae.

As part of performing my analysis, I utilized a team of professionals who worked under my direction and control. The opinions expressed herein are subject to change, based upon any additional discovery in the case or information that I may receive, after the date of this report.

## II.   Summary of Opinions

Based on my evaluation and analysis of the financial and operational data, testimony and documents produced in this matter, I have reached the following opinions, assuming liability:

- CPC's Amended Rule 26(a)(1)(c) Disclosure provides no support or bases whatsoever for the damages alleged by CPC and as a result, does not represent a reasonable estimate of damages in this matter;

- The proper period over which to measure damages is January 2000 through September 2001; and

- CPC suffered $237,516 in damages.

## III. Background

CPC, based in Broadview, Illinois, is a provider of commercial paper printing services. Heidelberg is a global manufacturer of printing presses and other equipment. Its U.S. operations are headquartered in Kennesaw, Georgia.

On October 7, 1999, CPC signed an agreement to purchase a used 40-inch, CD102 6+ LX 1994 printing press ("Six-Color Press") from Heidelberg for $1.35 million to replace its MOFP-H 1994 Heidelberg printing press ("Five-Color Press"). The Six-Color Press was delivered to CPC in December 1999 and installed at CPC's new Broadview location.

Since its delivery to CPC, the Six-Color Press has experienced certain operating difficulties including streaks, slurs and variances in color. Heidelberg and service repair personnel operating at Heidelberg's request and third-party contractors have replaced certain parts and performed certain adjustments to the Six-Color Press to resolve the problems claimed by CPC. In February 2001, CPC told Heidelberg representatives that they would no longer be given an opportunity to remedy operational difficulties with the Six-Color Press.

By April 2001, CPC had "learned how to work around [the problems] to minimize their effect." (CP6 00024) Later in 2001, CPC filed a lawsuit. CPC seeks to recover alleged damages in excess of $2.4 million from Heidelberg, including the recovery of all monies paid to acquire and finance the Six-Color Press and have the purchase of the Six-Color Press rescinded. Heidelberg has filed a counterclaim seeking payment for approximately $40,000 of unpaid invoices for parts, services and consumables.

## IV. Analysis of Damages Claimed by CPC

CPC's Amended Rule 26(a)(1)(c) Disclosure provides a list of expenditures and lost profits that CPC alleges it incurred due to its acquisition of the Six-Color Press.

Specifically, the disclosure:

- Fails to provide any computation or methodology used by CPC to derive its damage claim.

- Fails to identify the documents that were used to prepare CPC's computation of damages.[1]

- Fails to make the appropriate comparisons concerning the performance of the Six-Color Press from 2000 to 2002. In conducting its analyses, CPC compares the performance of the Five-Color Press in 1998 rather than 1999, the year prior to the installation of the Six-Color Press, to the Six-Color Press from 2000 to 2002.

- Fails to use the appropriate period for damages. CPC extends its period for damages through December 31, 2002 even though by September 2001 it had reduced to a minimum, if not completely mitigated, the effects of the problems with the Six-Color Press. See further discussion about the appropriate damage period below.

- Fails to consider that overtime may have been caused by reasons unrelated to the initial operational difficulties with the Six-Color Press.[2] CPC has claimed that it would not have incurred expenditures for overtime pay had the Six-Color Press been working properly. CPC derived its damage figure by adding all of the overtime pay identified in the payroll records for each of the press people that worked on the Six-Color Press during 2000, 2001 and 2002.[3] For example, CPC did not consider:

---

[1] On September 4, 2003 CPC provided certain documents as support for its Amended Rule 26(a)(1)(c) Disclosure. A preliminary analysis of these documents indicate that they form an insufficient bases for the damages claimed by CPC. Due to the timing of the document production, I reserve the right to supplement my report after further analysis of the documents is performed.

[2] Deposition of Donald Outlaw, August 25, 2003, p. 226 lines 16-22.

[3] Deposition of Donald Outlaw, August 25, 2003, p. 225 line 8 – p. 226 line 15.

o Overtime occurring in the normal course of business[4];

o Rework related to mistakes by the pressmen[5];

o Customer alterations[6];

o Competency of the employees such as the pre-press person terminated for poor performance[7];

o Start up and learning time; or

o Rush jobs[8].

• Fails to consider that additional repair and maintenance expenses may have been caused by reasons unrelated to the initial operational difficulties with the Six-Color Press. For example:

o A review of the equipment repair and maintenance expenses of CPC indicates that the average annual repair and maintenance expense for 2001 and 2002 was less than CPC's repair and maintenance expenses in 1998 and 1999.

o Although 2000 had a spike in repair and maintenance expenses of approximately $50,000, Mr. Outlaw was unable to state with any degree of certainty that the increased costs were due to the Six-Color Press. In fact, he did speculate that the rise in costs in 2000 might be due to press

[4] Deposition of Donald Outlaw, August 25, 2003, p. 235 line 19 – p. 236 line 3.

[5] Deposition of Donald Outlaw, August 25, 2003, p. 226 line 16 – p. 227 line 7.

[6] Deposition of Donald Outlaw, August 25, 2003, p. 227 lines 12-20.

[7] Deposition of Donald Outlaw, August 25, 2003, p. 291 lines 6-12.

[8] Deposition of Donald Outlaw, August 25, 2003, p. 235 lines 9-18.

installation costs and other costs of moving to a new facility having been included in the repair and maintenance expense account.[9]

- o The costs could have been incurred in the normal course of business. The press was five years old at the time of acquisition and as with any used and aging piece of equipment, parts do break from time to time. To maintain the Six-Color Press in working order, routine maintenance would likely need to be performed on the press.

CPC's Answers to Defendant Heidelberg's First and Third Sets of Requests for Admission disclose that there are numerous invoices issued by Heidelberg that CPC never paid and/or Heidelberg forgave. The total amount of invoices CPC actually paid to Heidelberg for repair and maintenance of and parts for the Six-Color Press is $24,189 through December 31, 2002.

- • Fails to consider that additional labor costs related solely to work performed in the bindery department may have been caused by reasons unrelated to the initial operational difficulties with the Six-Color Press. Mr. Outlaw testified on August 25, 2003, that the damage amount for this area is caused by the labor cost in the bindery department for jobs coming off of the Six-Color Press in 2000, 2001 and 2002 exceeding costs of the Five-Color Press in 1998.[10] There is no indication that CPC considered:

  - o The composition of jobs, i.e. the volume of jobs requiring <u>only</u> bindery work, thereby causing increased bindery labor expenses;

---

[9] Deposition of Donald Outlaw, May 23, 2003, p.39 line 8 – p. 49 line 11.

[10] Deposition of Donald Outlaw, August 25, 2003, p. 237 line 20 – p. 239 line 7.

o Macroeconomic effects such as the increased cost of labor two, three or four years after CPC's base year of 1998[11];

o Start up and learning time;

o Competency of the employees; or

o Costs already considered in the claim for reimbursement of overtime costs.

- Fails to consider that raw material expenses may have been caused by reasons unrelated to the initial operational difficulties with the Six-Color Press. The claim for additional raw material expenditures was computed using the same approach used to determine the additional labor costs. There is no indication that CPC considered:

o Macroeconomic effects such as the increased cost of raw materials;

o Excessive spoilage by employees such as that which led to the termination of a pre-pressman[12];

o Changes caused by customer alterations;

o Start up and learning time;

---

[11] The printing industry is a mature market. In 2000 and 2001, analysts were projecting average annual growth in the range of 3%-5%. The printing industry was continuing its move toward consolidation and technological improvements to identify ways to cut costs. Large printers with access to capital to invest in technology and the ability to create economies of scale were well positioned to succeed.

Labor and paper costs, which account for approximately 60% of a printer's revenues, were projected to spike significantly in 2000 and 2001 relative to 1999. In 2000, UBS Warburg forecast an 11%-14% increase in the cost of paper, excluding newsprint, followed by a 4%-5% increase in prices in 2001. In addition, labor prices were forecast to increase 4%-5% in 2000 and another 3%-4% in 2001. The rising costs of paper and labor coupled with the mature market projected declining profits for smaller printing companies.

[12] Deposition of Donald Outlaw, August 25, 2003, p. 291 lines 6-12.

    o  Rework caused by employee error; or

    o  The possibility that the Six-Color Press requires more raw materials than the Five-Color Press.[13]

- Fails to consider that costs for downtime may have been caused by reasons unrelated to the initial operational difficulties with the Six-Color Press. According to Mr. Outlaw's testimony the claim for these costs is computed by multiplying the number of hours the press was down by the hourly wages of the pressman. There is no indication that CPC considered:

    o  The claim for overtime already encompasses the hours CPC's employees worked beyond the normal 40-hour week.

    o  The press is required to undergo routine maintenance and any downtime related to those actions should not be included.

- Misrepresents negotiations with prospective buyers of CPC. Mr. Outlaw claims that CPC would have been acquired in 2001 for approximately $2.4 million, but for its ownership of the Six-Color Press. Stephen Richards, Vice President of Richards Graphic Communications (identified as the potential acquirer), testified in his deposition that there was a scenario proposed *solely by CPC* that Richards Graphic Communications acquire a 25 percent interest in CPC for $600,000 (which mathematically computes to a $2.4 million purchase price for the entire business). While Mr. Richards' company evaluated acquiring CPC, "there was never a proposal made or offer made or a letter of intent"[14] issued by Richards Graphic Communications to CPC.

---

[13] Deposition of Donald Outlaw, August 25, 2003, p. 240 lines 17-20.

[14] Deposition of Stephen Richards, March 6, 2003, p. 32 lines 10-16.

8

In addition, CPC has not obtained a current valuation of the Company. In fact, CPC has not made any attempt to sell or market the business since its discussions with Richards Graphic Communications.[15] Mr. Outlaw's basis for his current valuation of CPC ($0) is that "No one's offered me any money for it".[16] Based upon the above, CPC has not presented any sound or reliable basis for either its former $2.4 million valuation of CPC or its present valuation of $0.

- Misrepresents claims that CPC lost Richards Graphic Communications as a customer due to problems with the Six-Color Press. Stephen Richards testified that Richards Graphic Communications ceased giving CPC print jobs for the Six-Color Press because it purchased its own 40-inch press for reasons other than the quality of printing from CPC's Six-Color Press.[17] Don Outlaw confirmed that Richards Graphic Communications acquired its own six-color press and, therefore, was able to capture the profits that they would have otherwise given up to CPC.[18]

- Fails to make a correlation between the debts listed and the alleged operational difficulties with the press. Accordingly damages are not warranted for these items.

For the reasons stated above, CPC has not provided a sufficient basis for supporting its lost profits damage claim provided in its Amended Rule 26(a)(1)(c) Disclosure. The deficient disclosure and document production places me in the disadvantageous position of not having access to all of the documents and methodologies CPC used to develop its claim, thereby limiting my ability to rebut CPC's damage claim.

---

[15] Deposition of Donald Outlaw, August 25, 2003, p. 254 lines 19-25.

[16] Deposition of Donald Outlaw, August 25, 2003, p. 253 line 20 – p. 254 line 25.

[17] Deposition of Stephen Richards, March 6, 2003, p. 37 line 1 – p. 39 line 16.

[18] Deposition of Donald Outlaw, August 25, 2003, p. 252 line 25 – p. 253 line 19.

## V.     Dudney Damages Analysis

To analyze damages in this case, I first considered the appropriate framework within which damages, assuming liability, should be calculated. The documents I reviewed in this matter reflect that CPC actively pursued and ultimately purchased a Six-Color Press. CPC was not satisfied with the performance of the Six-Color Press and believes that it lost sales and profits as a result of the alleged problems with the Six-Color Press. As discussed further below, CPC and its agents were eventually able to get the press to perform at an acceptable level for equipment of this type. Therefore, if liability is found in this matter, CPC should be entitled to damages to compensate for the Six-Color Press' failure to meet CPC's reasonable performance expectations. Based on discussions with counsel, I have been asked to assume that CPC is legally not entitled to rescission of the contract and restitution of the purchase price and related financing expenses.

### A.   Determination of the Appropriate Damage Period

As a first step in conducting my damages analysis, I evaluated the appropriate time period over which to measure damages. To conduct my analysis I reviewed (1) contemporaneous financial reports CPC provided to a prospective lender, Associated Bank, and (2) interactions CPC had with machinery repair and maintenance personnel.

### 1.   Financial Reports

I reviewed the historical financial performance of CPC and correspondence with and CPC financial reports sent to Michael O'Rourke of Associated Bank[19]. During this review I noted the following:

- For the six-month period ended June 30, 2000, there were additional Six-Color Press costs caused by "start up and learning time" incurred by CPC employees

---

[19] CPC was attempting to develop a lending relationship with Associated Bank to replace its current lender, Bank One.

unfamiliar with the new machine and additional repair costs for the Two-Color and Six-Color Presses. (CP6 00026)

- For the six-month period ended December 31, 2000, CPC's refers to additional costs of the Six-Color Press related to repair costs and down time for the repairs causing certain employees to work overtime. (CP6 00025)

- For the four-month period ended April 2001, despite CPC's claims of continued problems with the Six-Color Press, CPC reported to the bank that it had "learned how to work around [the problems] to minimize their effect." (CP6 00024)

- May, June and July of 2001 there is no mention of any loss of income or additional costs due to sub-par performance of the Six-Color Press. (CP6 00021-23)

  - The June 2001 financial report touts CPC's gross profit turnaround relative to the same six-month period for the prior year (improved gross profit percentage by 132%).

  - The July 2001 financial report cites only higher outside purchases[20] as the cause for gross profit being lower than normal. No mention is made of issues related to the Six-Color press.

- For the year ended December 31, 2001 and projection for 2002, there is no mention of any actual or possible reduction in sales or profits caused by the Six-Color Press. Rather, blame for sales (and thus profits) being lower than CPC's expectations is placed on the attacks of September 11, 2001 and the country being in an economic recession. (CP6 00019)

---

[20] During Donald Outlaw's deposition he explained that the cost to ready a print job for mailing (i.e., addressing, labeling and sorting) was an example of an outside purchase. May 23, 2003 Deposition of Donald Outlaw, p. 98 line 17 – p. 99 line 16.

## 2. Damages Were Mitigated

- Steve Poplin, printing press repairman for Druck-Tech Inc., visited CPC on September 12, 2001 to diagnose the problem with the Six-Color Press. Mr. Poplin gave Don Outlaw "an overview of the parts that he was going to have to order and the amount of time it was probably going to take" to replace the grippers and perform a gear alignment to put the Six-Color Press in proper working order. The price quote to perform the proposed maintenance was $10,000 to $15,000. At that time Mr. Outlaw refused the service, citing cash constraints. Mr. Outlaw waited until August 2002 to authorize Mr. Poplin to perform the service.[21] Subsequent to replacing the grippers and performing the gear alignment Mr. Poplin thought "that there [was] a general consensus that the performance of that [Six-Color P]ress and the printing quality [was] much improved".[22]

- In fact, prior to Mr. Poplin's visit, on January 29, 2001, during a service call at CPC, Vincent Romano, Heidelberg's service manager, and other Heidelberg representatives explained that Heidelberg would like to review the grippers and pads and a possible gear alignment to determine if further mechanical adjustments were required to ensure the Six-Color Press performed to CPC's satisfaction.[23] However, Mr. Romano testified that, despite attempts to set up a time to perform the work, on or before February 12, 2001, CPC declined to permit the Heidelberg employees to perform additional service work on the Six-Color Press because "they felt as though we had our opportunities to address these problems and ... allowing us to continue with any further mechanical repairs wasn't an option."[24]

---

[21] Deposition of Steven Poplin, July 11, 2003, p. 99 line 20 – p. 104 line 1.

[22] Deposition of Steven Poplin, July 11, 2003, p. 179 line 20 – p. 180 line 1.

[23] Deposition of Vincent Romano, April 9, 2003, p.53, line 15 – p. 54 line 3.

[24] Deposition of Vincent Romano, April 9, 2003, p. 54 lines 4-17.

Based on (1) the representation CPC made in its financial report to its lenders that by April 2001 it had "learned how to work around" the problems experienced with the Six-Color Press "to minimize their effect", (2) the fact that all of CPC's subsequent reports to Associated Bank failed to identify any continued deterioration in financial performance attributable to the Six-Color Press, and (3) the fact that CPC had the opportunity to substantially improve the performance of the press by expending $10,000 to $15,000 in September 2001 (if not before) supports the calculation of damages, assuming liability, between January 1, 2000 and September 30, 2001.

## B. Lost Profits Calculation Methodology

After establishing the appropriate period during which to calculate damages, I next undertook an analysis of CPC's historical financial and operating performance to quantify any damages incurred by CPC.

### 1. CPC's Sales

CPC's historical financial performance reveals that sales were relatively flat from 1998 to 2002. In 1999, immediately prior to CPC's acquisition of the Six-Color Press, its revenues were the lowest during this five-year period, down approximately 6.7% from the prior year. However, sales in 2000 and 2001 increased approximately 2.4% and 3.0% over the prior year, respectively. CPC's sales performance does not indicate that it lost any sales as a result of its acquisition of the Six-Color Press.

### 2. CPC's Gross Profit

CPC calculates gross profit by subtracting the costs of sales from the Company's net revenues. At CPC, cost of sales includes expenses for direct materials (paper, ink, etc.), plant wages, outside purchases, repair and maintenance on the presses, depreciation, certain financing costs, utilities, rent and other factory expenses. To analyze the gross profit earned by CPC, I made certain adjustments to the income statements in CPC's general ledger system to isolate the change in gross profit that arguably could have been caused by operational difficulties with the Six-Color Press. Therefore, I excluded rent

13

expense, depreciation expense, AGFA finance expenses and certain lease expenses to achieve an adjusted gross profit.

As a result of my analysis, I identified an approximately 24% decline in CPC's adjusted gross profit margin in 2000 relative to the prior five-year period. The adjusted gross profit margin earned by CPC in 2000 was 26.6% as compared to the average adjusted gross profit earned by CPC in the five-year period ended December 31, 1999 of 35.1%. In a financial report provided to Associated Bank, CPC attributed the decline in gross profit for the first six months of 2000 to, among other things, "[s]tart up and learning time on the new presses caus[ing] excess paper usage and time in running jobs." (CP6 00026)

The adjusted gross profit margin earned by CPC in 2001, 31.8%, increased approximately 20% compared to 2000 levels. The rise in adjusted gross profit margin is consistent with CPC's representations, as described in another financial report provided to Associated Bank, that it had "learned how to work around [the problems with the Six-Color Press] to minimize their effect" by April 2001. (CP6 00024)

### 3. Analysis of Printing Jobs Performed for a Sample of Customers

To analyze damages, which may have been caused by the alleged operational difficulties with the Six-Color Press, I analyzed the available data for the jobs performed for CPC's 15 largest customers.

#### a) Sample of CPC Jobs

To select my sample, I reviewed the sales by customer as reported on CPC's Sales-By-Salesperson report to determine the 15 largest customers in each of the years ending December 31, 1999, 2000 and 2001. A list of these customers is provided at Exhibit 4. I then requested the job costing records for each project CPC performed on behalf of these customers in from 1999 to 2001. However, CPC was unable to supply me with the job costing records for all of the jobs performed for these customers because they did not retain the requisite documents.

The following chart identifies the sales for which job costing records were requested as a % of total sales and the records actually received.

| | Total Sales Records Received | Total Sales Records Requested | % of Sales $s Records Received of Requested | Total Sales for the Year | % of Sales $s Records Requested of Total Sales |
|---|---|---|---|---|---|
| 1999 | $ 1,368,727 | $ 2,050,108 | 66.8% | $ 2,916,751.0 | 70.3% |
| 2000 | $ 1,884,113 | $ 2,059,106 | 91.5% | $ 2,986,474.0 | 68.9% |
| 2001 | $ 2,023,811 | $ 2,204,600 | 91.8% | $ 3,074,668.0 | 71.7% |

Therefore, my sample size included 47.0%, 63.0 % and 65.8% of the total sales dollars in each of the years ended December 31, 1999, 2000 and 2001, respectively.[25]

Based upon my review of certain of these records and the deposition testimony provided in this matter, I noted that estimates of the sales price and costs of the job are memorialized on the Combination Estimate Print. The actual sales price and costs of the project are recorded on the Detail Cost Sheet and the Final Cost Sheet.

I reviewed each of the three documents for jobs whose records were provided to evaluate the actual sales and gross profits earned for jobs performed on each press.

b)  Sales

To determine the concentration of sales by press-type for the sample documents, I reviewed all of the costs sheets in the sample. In doing so, I identified the press that the individual jobs were performed upon and the ultimate sales value. The sales information by press type is summarized as follows:

---

[25] Percentages are calculated by multiplying column four of the chart above by column six of the same chart to provide the percentage of CPC total sales dollars that are in the sample.

|  | 1999 | 2000 | 2001 |
|---|---|---|---|
| Two-Color Press | 37.6% | 37.2% | 28.8% |
| Five-Color Press | 41.5% | N/A | N/A |
| Six-Color Press | N/A | 38.2% | 48.1% |
| Combination of presses | 17.8% | 23.0% | 21.6% |
| Non-print Jobs | 3.1% | 1.6% | 1.5% |
| Total | 100.0% | 100.0% | 100.0% |

Based upon sales, revenues earned in 1999 and 2000 were fairly evenly dispersed between the two active presses or a combination of the two. In 2000 and 2001, more of the revenues were earned on jobs performed on the Six-Color Press as opposed to jobs performed on the Two-Color Press. The proportion of jobs placed on the Six-Color Press in 2001 exceeded that of the Five-Color Press in 1999 indicating a larger throughput for and reliance on the Six-Color Press by CPC.

### c) Gross Profit

To analyze the profits CPC lost, assuming liability, I calculated the gross profit percentages, as provided in the chart below, that CPC earned in 1999 through 2001 using the information in CPC's cost sheets.[26] As indicated in the chart below, there was a significant decline in the gross profit percentage for the jobs performed on the Six-Color Press in 2000 and 2001 as compared to the jobs performed on the Five-Color Press in 1999. Since the Two-Color Press' performance also deteriorated significantly from its 1999 levels, the data provides one indication that macroeconomic forces impacted the entirety of CPC's business.

|  | 1999 | 2000 | 2001 |
|---|---|---|---|
| Two-Color Press | 23.4% | 15.4% | 19.8% |
| Five-Color Press | 36.6% | N/A | N/A |
| Six-Color Press | N/A | 11.3% | 19.8% |
| Combination of presses | 19.3% | 23.4% | 14.3% |

---

[26] See Exhibit 6b.

## d) Rework

I also reviewed the rework performed by CPC for its Six-Color Press jobs compared to rework performed for its Five-Color Press jobs. In doing so, I found that the jobs run on the two presses were fairly comparable. Rework for the Five-Color Press amounted to 3.9% of the cost of sales for Five-Color Press jobs while rework for the Six-Color Press amounted to 3.9% and 3.5% of the cost of sales for Six-Color Press jobs in 2000 and 2001, respectively. Therefore, the amount of rework on the two presses was consistent as the data provides no indication that the Six-Color Press created additional rework costs for CPC.

As discussed above, I reviewed the gross profit margin that was earned on the three types of presses in 1999, 2000 and 2001. In doing so, I identified that the Six-Color Press did not perform as well as the Five-Color Press and that the gross profit earned on the Two-Color Press in 2000 and 2001 relative to 1999 had also declined. I also identified that, on a per job basis, CPC had a similar distribution of favorable and unfavorable variances (actual costs vs. estimated costs) for the Six-Color Press as the Two-Color Press in 2000 and 2001.

The decline in profits experienced on the Two-Color Press and the economic climate of the printing industry, as described above, indicate that factors in addition to the alleged problems with the Six-Color Press contributed to the gross profit erosion when comparing the Six-Color Press to the Five-Color Press. As I evaluated damages, I used the historical performance of the Two-Color Press to establish an index to apply to the gross profit percentage earned in 1999 for the jobs performed on the Five-Color Press and a combination of presses to create a more accurate comparison of the performance of the Six-Color Press.

Based upon an application of this index, I estimated that the Six-Color Press would have achieved a 24.1% and 31.0% gross profit percentage in 2000 and 2001, respectively, had it performed similarly to the Five-Color Press in terms of overall margin and the Two-Color Press in terms of reactions to other factors (e.g., macroeconomic) affecting CPC's

financial performance. Thus, the Six-Color Press under performed reasonable expectations by 12.8% and 11.2% in 2000 and 2001, respectively. See Exhibit 6a.

Applying the same index to the gross profit percentage earned on jobs performed on a combination of the presses ("Combination Jobs") in 1999 projects that CPC's Combination Jobs should have earned 12.7% and 16.4% in 2000 and 2001, respectively. In actuality, the Combination Jobs exceeded the projection by 10.7% in 2000 and under performed the projection in 2001 by 2.1%. See Exhibit 6a.

I then used my sample to determine an allocation of sales from the Six-Color Press and the Combination Jobs for the entire Company in 2000 and the first nine months of 2001. I utilized these sales figures, the information about the performance of these jobs and the period for damages to determine a range for CPC's lost profits, if liability is found in this matter, due to the performance of the Six-Color Press. Based upon this analysis, if liability is found in this matter, CPC is entitled to a damages award of $237,516 (the midpoint of the range). See Exhibit 6.

## VI. Conclusion

Based on my evaluation and analysis of the financial and operational data, testimony and documents produced in this matter, I have reached the following opinions, assuming liability:

- CPC's Amended Rule 26(a)(1)(c) Disclosure provides no support or bases whatsoever for the damages alleged by CPC and as a result, does not represent a reasonable estimate of damages in this matter;

- The proper period over which to measure damages is January 2000 through September 2001; and

- CPC suffered $237,516 in damages.

## VII. Compensation

AlixPartners, LLC is being compensated at my normal and customary rate of $425 per hour for my time and between $100 and $375 per hour for staff working at my direction.

## VIII. Additional Analysis and Demonstrative Aids

I reserve the right to amend and/or supplement this report based upon any new and/or additional facts or other documents which may come to my attention, or information, including expert reports, deposition testimony and related document exhibits thereto, which may be produced. If I am called upon to testify, I may prepare demonstrative aids, such as graphs, charts or tables.

## IX.    Exhibits

Exhibit 1 – Curriculum Vitae

Exhibit 2 – Listing of Testimony in the Last Four Years

Exhibit 3 – Listing of Articles Published in the Last Ten Years

Exhibit 4 – Listing of Top Customers

Exhibit 5 – Income Statement Summary

Exhibit 6 – Calculation of Lost Profits

Exhibit 7 – Documents Reviewed


Louis G. Dudney, CPA
September 5, 2003